## Combs v. Commonwealth.

May 3, 1940.

S. M. Ward, Judge.

C. A. Noble and Olney B. Owen for appellant.
Hubert Meredith, Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Affirming.

The appellant was convicted of voluntary manslaughter, sentenced to five years' imprisonment, and has appealed to this Court, urging as grounds for reversal that the verdict of the jury finding her guilty was flagrantly against and not supported by the evidence, and that the Trial Court erred in failing to instruct that the appellant had the right to defend herself from danger apparent at the hands of the wife of her victim. The decision of the questions thus raised requires a summary of the testimony.

The appellant, twenty-five years of age, slight of stature, and the mother of two children, resided with her husband, Manuel Combs, in Glomawr, a mining camp in Perry County. Manuel was a foreman of a coal company, and among their neighbors were the deceased, Richard Ricketts, and his wife. For some years prior to the homicide, which occurred on February 27, 1939, Ricketts had been infatuated with appellant, broken into her home at night during the absence of her husband, and, on several occasions, while intoxicated, threatened to kill her. Although vehemently denied by appellant, there is testimony in the record indicating that the infatuation was mutual. On several occasions appellant had caused warrants to be issued for Rickett's arrest, and shortly before the homicide she had procured warrants for the arrest of several women in the neighborhood because of their "tattling." However, none of these warrants were prosecuted by the appellant, who testified that Ricketts had "begged and pleaded and my husband let him out," and had threatened that if she prosecuted the charges against the women, he would take the stand and testify that the gossip was true. Whether in fact appellant's relations with Ricketts were such as to justify the gossip concerning them, we need not attempt to decide. It is sufficient to say that Ricketts is shown to have been a violent and dangerous man when under the influence of liquor, and that appellant had cause to be, and was in fact, afraid of him. The homicide occurred late in the afternoon at the home of appellant's cousin, Jessie Payne, during the funeral of his wife. His home consisted of three rooms built in a row. It was high off the ground

on the front side and the middle room opened on to a front porch. The corpse was in the middle room, and many people visited the home on that night, among them, appellant and her two small children, and Ricketts and his wife and their three children. The appellant arrived before the deceased and was sitting by the casket when the deceased and his wife arrived. Appellant was talking to some neighbors by the name of Farris, at whose home one of the difficulties appellant had had with Ricketts occurred. Deceased and his family did not stop in the room where the corpse was but passed on into the kitchen and thence to a little porch at that end of the house. Almost immediately thereafter Mrs. Ricketts returned through the kitchen and called appellant to the porch where Mrs. Ricketts had left her husband. Appellant's version of what then transpired is:

"A. When I went out on the porch he was setting over here next to a post with the baby in his arms and she went up to him and said, 'I'll take the baby.'

"Q. Go ahead. A. She reached to get the baby and he said, 'What in the God Damn Hell do you mean by setting down by them God Damn Farris'?'

"Q. When he said that he was still sitting down? A. Yes, sir.

"Q. Go ahead and tell what was said? A. And his wife spoke to him and said, 'Don't talk so loud, here stands two men.

"Q. Tell everything? A. And he said, he asked me why I sat down by those Damn Farris,' and I said, 'Why, I was just sitting by them.' He said 'By God, I'll find out,' and he come out with his pistol.

"Q. Was he sitting down or standing up at that time? A. He was standing up, he had got up.

"Q. Where was Mrs. Farris standing with reference to you and Mr. Farris, I mean Rickett? A. She was standing over here on the side of me.

"Q. When he pulled his pistol there, what did you do? A. I shot him."

Asked why she shot Ricketts, she replied that she

"was afraid not to"—that she was afraid he would hurt her. Barnett Combs and Press Plowman, the former a peace officer and a cousin of the appellant, and the latter, an uncle, testified that when they reached Ricketts after he had been shot, he was standing upright with a pistol in his hand, but no witnesses other than appellant and Mrs. Ricketts attempted to testify as to the actual facts of the killing, although other witnesses saw Ricketts immediately after he had been shot and stated that they saw no pistol in his hand. Mrs. Ricketts testified that she and her husband on entering the house did not stop in the room where the corpse was because all of the seats were filled, but went on through to the kitchen and from there to the back porch where she gave Mr. Ricketts the baby and told him to hold it until she went to the toilet.

> "There wasn't anybody in the back yard but the toilet door was fastened and I went back and I told him to hold it until I asked somebody to go with me. I knew this woman (appellant) better than anybody else there, she had always been a better friend to me than anybody up there and I went in and asked her to go with me. We went out through the kitchen, I was in front and when I got out the door on to the porch where he was holding the baby it was kind of fretting and I saw some men in the yard and I told him to let me hold the baby a few minutes till the men went down the bank. Just as I got the baby out of his arms the shooting started, it was over with before I realized what had happened. I noticed he grabbed his stomach, like that, and bent over and kind of sagged against the porch and by that time the people had crowded in there and I didn't see him any more till he was on the store porch."

She further testified that she was standing within a foot and a half of the appellant and the deceased who was sitting on the porch bannister; that nothing was said by either of them; and that her husband had no pistol or weapon of any kind in his hand when he was shot. Considering appellant's justifiable fear of Ricketts occasioned by his former conduct, it is probably true that if he cursed or threatened her when she came on to the porch, she shot him in what appeared to her

to be her necessary self defense. But she was unable to suggest any reason why Ricketts should have objected to her talking with members of the Farris family or abused her for having done so; and we cannot ignore the testimony of Mrs. Ricketts that her husband said nothing to appellant and made no move or gesture toward her. Moreover, numerous witnesses, including the minister who was present to conduct Mrs. Payne's funeral services, testified that appellant stated immediately after the shooting that she had done what she came there to do and what her husband had told her to do. Furthermore, she was contradicted in her testimony that she had not especially armed herself for that particular occasion. Although denied by appellant, it was shown by the testimony of one of the girls who accompanied her that afternoon that appellant on passing Ricketts on the road, asked the witness to wait for her while she returned to her house and got her pistol.

Counsel for appellant suggests that appellant was enticed to the porch in order that Ricketts by violence toward her might prove to Mrs. Ricketts that he cared nothing for appellant, and in support of this argument points to the fact that under the circumstances, and in view of the large number of women present, it was strange that Mrs. Ricketts should have selected appellant to accompany her to the toilet. The Attorney General suggests that appellant killed Ricketts in obedience to the command of her husband. As for ourselves, we are wholly unable to fathom the motives underlying the tragedy. In any event, the case was one peculiarly within the province of the jury to decide.

There was no evidence whatsoever which would have justified an instruction on the right of appellant to protect herself against Mrs. Ricketts; and it is equally certain that we would not be justified in holding that the verdict was so flagrantly against the evidence as to indicate passion or prejudice in the jury which rendered it.

**Judgment affirmed.**